1

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7                        DISTRICT OF NEVADA

8                                * * *

9   REGINALD C. HOWARD,            Case No. 2:19-cv-00500-GMN-BNW

10                    Petitioner,   ORDER

11        v.

12   JAMES DZURENDA,[1]  et al.,

13                    Respondents.

14

15        Reginald C. Howard's pro se 28 U.S.C. § 2254 amended habeas corpus petition

16   is before the court for final adjudication on the merits (ECF No. 10).  As discussed

17   below, the petition is denied.

18        **I.      Background & Procedural History**

19        In July 2015, a jury convicted Howard of burglary (exhibit 43).[2] The state district

20   court adjudicated him a habitual criminal and sentenced him to 10 years to life,

21   consecutive to a sentence previously imposed in a different case. Exh. 47. Judgment of

22   conviction was entered on December 2, 2015. Exh. 50.

23

24

25   [1] According to Howard's petition as well as the state corrections department's inmate locator page,
     he is incarcerated at High Desert State Prison. The department's website reflects Calvin Johnson
26   is the warden for that facility. At the end of this order, the court directs the clerk to substitute Calvin
     Johnson for prior respondent James Dzurenda, under, *inter alia*, Rule 25(d) of the Federal Rules
27   of Civil Procedure.

28   [2] Exhibits referenced in this order are exhibits to respondents' motion to dismiss, ECF No. 21, and
     are found at ECF Nos. 22-28, 30.

1    The Nevada Court of Appeals affirmed Howard's conviction in 2017 and affirmed

2    the denial of his state postconviction habeas corpus petition in 2018. Exhs. 70, 91.

3    Howard dispatched his federal habeas corpus petition for filing in March 2019

4    (ECF No. 4).  Soon after, he filed an amended petition (ECF No. 10). Respondents have

5    now answered the remaining claims (ECF No. 43).  Howard filed a reply and a

6    supplemental reply (ECF Nos. 46, 46). The court has considered all briefing.

7    **II.    Legal Standard**

8    **AEDPA Standard of Review**

9    28 U.S.C. § 2254(d), a provision of the Antiterrorism and Effective Death Penalty

10   Act (AEDPA), provides the legal standards for this court's consideration of the petition in

11   this case:

12   An application for a writ of habeas corpus on behalf of a person in
     custody pursuant to the judgment of a State court shall not be granted with
13   respect to any claim that was adjudicated on the merits in State court
     proceedings unless the adjudication of the claim —
14

15   (1)     resulted in a decision that was contrary to, or involved an
     unreasonable application of, clearly established Federal law, as
     determined by the Supreme Court of the United States; or
16

17   (2)     resulted in a decision that was based on an unreasonable
     determination of the facts in light of the evidence presented in the State
     court proceeding.
18

19   The AEDPA "modified a federal habeas court's role in reviewing state prisoner

20   applications in order to prevent federal habeas 'retrials' and to ensure that state-court

21   convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S.

22   685, 693-694 (2002). This court's ability to grant a writ is limited to cases where "there is

23   no possibility fair-minded jurists could disagree that the state court's decision conflicts

24   with [Supreme Court] precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The

25   Supreme Court has emphasized "that even a strong case for relief does not mean the

26   state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538

27   U.S. 63, 75 (2003)); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing

28   the AEDPA standard as "a difficult to meet and highly deferential standard for evaluating

1   state-court rulings, which demands that state-court decisions be given the benefit of the

2   doubt") (internal quotation marks and citations omitted).

3       A state court decision is contrary to clearly established Supreme Court precedent,

4   within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts

5   the governing law set forth in [the Supreme Court's] cases" or "if the state court

6   confronts a set of facts that are materially indistinguishable from a decision of [the

7   Supreme Court] and nevertheless arrives at a result different from [the Supreme

8   Court's] precedent." *Lockyer*, 538 U.S. at 73 (quoting *Williams v. Taylor*, 529 U.S. 362,

9   405-06 (2000), and citing *Bell*, 535 U.S. at 694.

10       A state court decision is an unreasonable application of clearly established Supreme

11   Court precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court identifies

12   the correct governing legal principle from [the Supreme Court's] decisions but

13   unreasonably applies that principle to the facts of the prisoner's case." *Lockyer*, 538

14   U.S. at 74 (quoting *Williams*, 529 U.S. at 413). The "unreasonable application" clause

15   requires the state court decision to be more than incorrect or erroneous; the state

16   court's application of clearly established law must be objectively unreasonable. *Id.*

17   (quoting *Williams*, 529 U.S. at 409).

18       To the extent that the state court's factual findings are challenged, the

19   "unreasonable determination of fact" clause of § 2254(d)(2) controls on federal habeas

20   review. *E.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir.2004). This clause

21   requires that the federal courts "must be particularly deferential" to state court factual

22   determinations. *Id*. The governing standard is not satisfied by a showing merely that the

23   state court finding was "clearly erroneous." 393 F.3d at 973. Rather, AEDPA requires

24   substantially more deference:

25       .... [I]n concluding that a state-court finding is unsupported by
        substantial evidence in the state-court record, it is not enough that we
26       would reverse in similar circumstances if this were an appeal from a
        district court decision. Rather, we must be convinced that an appellate
27       panel, applying the normal standards of appellate review, could not
        reasonably conclude that the finding is supported by the record.
28

1   *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir.2004); *see also Lambert*, 393
2   F.3d at 972.

3   Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be
4   correct unless rebutted by clear and convincing evidence. The petitioner bears the
5   burden of proving by a preponderance of the evidence that he is entitled to habeas
6   relief. *Cullen*, 563 U.S. at 181.

7   **III.   Instant Petition**
8
9   **a. Claims Raised on Direct Appeal**

10   **Ground 12**[3]

11   Howard asserts that the trial court violated his Fifth, Sixth, and Fourteenth
12   Amendment right to effective assistance of counsel when it allowed him to represent
13   himself at trial (ECF No. 10, p. 41). Essentially, this is a claim that Howard did not
14   forego his right to counsel knowingly and intelligently.

15   A criminal defendant "may waive his Constitutional right to assistance of counsel
16   if he knows what he is doing, and his choice is made with eyes open." *Adams v. U.S. ex*
17   *rel. McCann*, 317 U.S. 269, 279 (1942) The United States Supreme Court held in
18   *Faretta v. California*:

19   It is undeniable that in most criminal prosecutions defendants could
20   better defend with counsel's guidance than by their own unskilled efforts.
     But where the defendant will not voluntarily accept representation by
21   counsel, the potential advantage of a lawyer's training and experience can
     be realized, if at all, only imperfectly. To force a lawyer on a defendant can
22   only lead him to believe that the law contrives against him. Moreover, it is
     not inconceivable that in some rare instances, the defendant might in fact
23   present his case more effectively by conducting his own defense.
     Personal liberties are not rooted in the law of averages. The right to
24   defend is personal. The defendant, and not his lawyer or the State, will
     bear the personal consequences of a conviction. It is the defendant,
25   therefore, who must be free personally to decide whether in his particular
     case counsel is to his advantage. And although he may conduct his own
26
27
28

---

[3] The court considers the remaining grounds for relief out of order.

1  defense ultimately to his own detriment, his choice must be honored out of "that respect for the individual which is the lifeblood of the law."

2  422 U.S. 806, 834 (1975). The Court explained that a defendant's "technical legal

3  knowledge, as such, was not relevant to an assessment of his knowing exercise of the

4  right to defend himself. *Id*. at 836. Denial of a defendant's timely and unequivocal

5  motion to represent himself violates the Sixth Amendment. *Id*. at 818-819.

6  The record reflects that the state court repeatedly attempted to warn Howard of

7  the challenges and dangers of self-representation. *See, e.g.*, exhs. 4, 6, 33. At an

8  August 2014 pretrial hearing, Howard informed the court that he wished to represent

9  himself. Exh. 2, pp. 7-14. The court questioned him about whether he fully understood

10  his rights and what representing himself entails. Howard indicated that he understood,

11  but he ultimately asked the court to appoint him alternate counsel, which the court did.

12  In November 2014, Howard again stated that he wanted to represent himself, and the

13  district court conducted a *Faretta* canvas. Exh. 7. The court questioned Howard in

14  detail, including regarding his education, legal knowledge and training, and why he

15  wished to represent himself.

16
17  COURT: You do realize an attorney is trained in the law and has the skill and experience to properly conduct a defense of your case?

18  DEFENDANT: I understand that.

19
20  COURT: An attorney knows the elements of the offense you have been charged with and the possible defenses that may be presented on your behalf.

21
22  DEFENDANT: I understand, yes, Your Honor.

23
24
25
26
27  COURT: Criminal trials present difficult choices as to strategy and tactics and even attorneys can differ as to the proper defense to make in a case. You are not trained to make these choices. An attorney knows the degree of proof that the State must meet to prove you're guilty beyond a reasonable doubt and by investigation and review of the State's evidence it may be determined that the State cannot prove its case. You must determine how to subpoena witnesses to testify on your behalf. Do you know how to subpoena a witness?

28

1   DEFENDANT: Yes, Your Honor. Basically, there is really no witnesses in this case. This is really a simple case I believe.

2   Exh. 7, pp. 6-7.

3   In response to the court's questions, Howard identified lesser included offenses,

4   the elements of the charges against him, and the range of punishments, including

5   habitual criminal treatment. He articulated his likely defenses.

6
    COURT: Sir, do you know the difference between an opening statement
7   and a closing argument?

8   DEFENDANT: I understand that the opening statement is basically where I'm going to lay out what I'm going to intend to prove to the jury as far as
9   my defense.

10  COURT: What is a closing argument?

11
    DEFENDANT: I'm going to try and sum it up as far as the evidence that
12  was presented in Court as far as the facts that were presented in Court to basically break it into a picture in which that the jury can understand my
13  point.

14
    COURT: Do you know how to object to a question that may be improper?
15

16  DEFENDANT: I haven't objected to a question that may be improper. I'm not saying I can basically the correct way to take every objection. I may
17  not be responsive to every objection, but I believe I would be able - - the ones that are crucial to my case I should be able to object to.

18

19  Exh. 7, p. 10. Howard clearly articulated the rights he would surrender and

20  steadfastly maintained his wish to represent himself. The court concluded that he clearly

21  expressed his desire to represent himself and he knowingly, intelligently, and voluntarily

22  waived the right to counsel.

23  COURT: And you understand you have the right to legal representation and that you're surrendering and giving up that right and you understand
24  the disadvantages of self representation?

25
    DEFENDANT: I understand I would not be able to allege ineffective
26  assistance of counsel. That would be one disadvantage and because of where I'm being housed at this time I may have problems as far as getting
27  to the law library or other investigative researches that may be more prevalent to an attorney who has better access to legal cases and
28  whatnot.

1   COURT: And even knowing all of those disadvantages you still wish to
2   represent yourself, sir?

3   DEFENDANT: Yes, I do.

4   COURT: Well, it seems to me like you responded better to the questions
5   contained in the Court's canvass than many of the other individuals that
    I've conducted this canvass of. So it looks to me like you've expressed
6   your desire to represent yourself. I guess we need a trial date.

7   Exh. 7, p. 12.

8   The Nevada Court of Appeals rejected this claim on direct appeal:

9           Howard first argues his actions at trial demonstrate he did not
10  knowingly, intelligently, and voluntarily waive his right to counsel. Our law
    requires that "to exercise the right to self-representation, a criminal
11  defendant must knowingly, intelligently, and voluntarily waive the right to
    counsel." *Hooks v. State*, 124 Nev. 48, 53-54, 176 P.3d 1081, 1084
12  (2008). "We give deference to the district court's decision to allow the
    defendant to waive his right to counsel." *Id*. at 55, 176 P.3d at 1085.
13

14          In determining whether a defendant's waiver is valid, however, the
    critical question is not how well the defendant performed at trial, but
15  whether the defendant understood the risks of self-representation and
    competently and intelligently chose to represent himself. *Graves v. State*,
16  112 Nev. 118, 124, 912 P.2d 234, 238 (1996). To ensure the defendant's
    choice to represent himself is valid, the trial court should conduct a *Faretta*
17  canvass to inform the defendant of the risks and determine whether the
    defendant knowingly, intelligently, and voluntarily waives his right. *Hooks*,
18  124 Nev. at 54-55, 176 P.3d at 1084- 85; *see also* SCR 253(1) (setting
    forth the guidelines and procedures district courts should follow when a
19  defendant requests self representation). When reviewing a criminal
    defendant's claim that his waiver was not valid, "we must consider the
20  record as a whole, including any canvass by the district court." *Hooks*, 124
21  Nev. at 55, 176 P.3d at 1085.

22          Howard did not include the transcript of his *Faretta* canvass in his
23  appellate record. It is the appellant's responsibility to provide this court
    with an adequate appellate record, and we assume missing portions of the
24  record support the district court's decision. *See Cuzze v. Univ. & Cmty.
    Coll. Sys. of Nevada*, 123 Nev. 598, 603, 172 P.3d 131, 135 (2007).
25  Howard's failure to include this transcript effectively "hamstrings our
    review" of this issue. *Thomas v. Hardwick*, 126 Nev. 142, 147, 231 P.3d
26  1111, 1115 (2010) (discussing an appellant's failure to include the voir dire
    transcript despite arguing error occurred during voir dire). We therefore do
27  not reverse on this basis.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exh. 70, pp. 3-4.

Howard presents nothing to demonstrate that the Nevada Court of Appeals' decision on federal ground 12 was contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).  The court notes that the state district court conducted a thorough canvass and that court's determination is entitled to deference. Accordingly, relief on ground 12 is denied.

**Ground 11**

Howard contends that the State violated his right to equal protection when it used peremptory challenges to exclude two African-American prospective jurors from the jury venire (ECF No. 10, p. 39).

Race-based peremptory challenges to excuse prospective jurors violate the Equal Protection Clause of the Fourteenth Amendment. *Batson v. Kentucky*, 476 U.S. 79 (1986). The United States Supreme Court requires a three-step procedure in reviewing a *Batson* claim: (1) the petitioner must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose"; (2) the "burden shifts to the State to explain adequately the racial exclusion by offering permissible race-neutral justifications for the strikes"; and (3) "[i]f a race-neutral explanation is tendered, the trial court must then decide ... whether the opponent of the strike has proved purposeful racial discrimination." *Johnson v. California*, 545 U.S. 162, 168 (2005) (internal quotations and citations omitted). This is because the three-step review process is not intended "to be so onerous that a defendant would have to persuade the judge — on the basis of all the facts, some of which are impossible for the defendant to know with certainty — that the challenge was more likely than not the product of purposeful discrimination." *Id*. Rather, to satisfy the first step, the defendant must produce "evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Id*. at 170. A defendant may rely on "any other relevant

circumstances" to support an inference of discriminatory purpose. *Id.* at 169. The Ninth

Circuit Court of Appeals has held that statistical disparity can raise a prima facie case.

*Williams v. Runnels*, 432 F.3d 1102, 1107-10 (9th Cir. 2006) In *Johnson*, the court

emphasized that a defendant need only show "an inference of discriminatory purpose"

and could not be required to show that a "challenge was more likely than not the

produce of purposeful discrimination." 545 U.S. at 170.

More recently, the Supreme Court reiterated the *Johnson* holding:

But when illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives. A *Batson* challenge does not call for a mere exercise in thinking up any rational basis. If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false.

*Miller-El v. Dretke*, 545 U.S. 231, 252 (2005). To "rebut an inference of

discriminatory purpose based on statistical disparity, the 'other relevant circumstances'

must do more than indicate that the record would support race-neutral reasons for the

questioned challenges." *Williams*, 432 F.3d at 1108.

Howard raised a *Batson* challenge, arguing that the State improperly struck two

of the three black potential jurors on the basis of race. Exh. 37, pp. 151-158. The State

(Patrick Burns) responded:

MR. BURNS: Well, I don't I don't know that he's established a pattern, but assuming that he has, Your Honor and I can do a *Miller-El* analysis as well relative to Mr. Martin, who is number 239 on the jury. The reason that Jurors number -- Juror numbers 231 and 235 have been stricken is that they have either -- they have relatives who have been in the criminal justice system in serious ways.

In particular -- and there's more specific things as to Mr. Gaddy. But for Ms. Ross, starting with her, she volunteered that she had a -- she had been arrested and treated unfairly by police. She was arrested for disorderly conduct and she was -- when she was questioning a police officer for what appeared to be her belief that the police officer wrongfully maced her cousin. So, that in itself is a reason that we wouldn't want her

1  on the jury, because she thinks she's been treated unfairly by police, and that's a non-race based, non-pretextual reason for that.

2

3  In addition, she indicates that pretty much --significant family members have been in and out of the criminal justice system. She said that, my mom has been in and out of jail for the longest time. She says that her brother is currently in prison for robbery. That's a non-pretextual, non-race based reason we can be -- you know, to strike someone, because they might have sympathy for people who have been accused of crimes, because they have in their own personal life people who have been accused of that.

4

5

6

7

8  Now, Mr. Gaddy has a – there's a related non-race based, non-pretextual reason for striking Mr. Gaddy. And Your Honor will note that, of all the people on the jury, I spent the most time with him, and I was trying to get explanations for a couple things. One, he shares the same thing that Ms. Ross has, that he's got a family member, a stepson, and he appeared that it was an important issue in the family that his wife's son was a murder defendant and is in prison for murder.

9

10

11

12  I couldn't really get a clear answer from him if he thought that he was treated fairly, unfairly, or in between. He just kind of disclaimed any knowledge of it. But it was evident that that was an important thing in the family. It's something that might lead him to be suspicious of the criminal justice system; it might also lead him to be sympathetic to people who are accused of crimes. That's one – that's an important aspect that he and Ms. Ross shared together.

13

14

15

16

17  Something that Mr. Gaddy had in addition, which gave us cause for concern, and I never really got a straight answer from him as to, you know, how he felt about the prosecution and all that kind of stuff. I mean, I was sympathetic to it, but he didn't really explain.

18

19

20  The other thing is, he explained that his background in radio originated basically doing philanthropic work for what sounded like at risk youth. He also explained -- when he was talking about his job, he said, I'm a socially conscious person. I -- and I asked him I first asked him, okay, you know, setting aside your job, do you have outlets for being a socially conscious person? He didn't -- he didn't answer that. He went back to talking about his job, and how his job prevents him from getting out the kind of dealing with the types of issues that he finds interesting in terms of being socially conscious.

21

22

23

24

25  So, I asked him that a second time, you know, well, setting aside the job entirely, you know, do you have outlets for this socially conscious -- being a socially conscious person? He didn't -- he didn't respond to that. He didn't give me a straight answer as to whether or not he had that or not.

26

27

28

Then we started talking about -- I asked him, well, you know, if your job permitted you to send out some of the messages, deal with some of the social issues that you think are really important, you know, what would those be? Again, I got no answer from him as to what those socially conscious issues -- or he started to talk a little bit about the west side, which I know is the Hand Owens area, which I tended to think is an area where a lot of the people are accused of crime --well, I know that from my experience in prosecution.

So, I'm not getting these explanations for him as to why he's a socially conscious person; how the fact his – the murder conviction of his son has affected him and his views of the criminal justice system. I'm not comfortable with his responses, and that's the reason why we elected, on a totally non-pretextual, totally non-race based reason, to not have him on the jury.

And I'll go to the *Miller-El* analysis. Three African Americans on the jury, and then Mr. Martin, who is Juror number 239, had none of these issues. He had -- he had a son that had a DUI issue, but talking to him, and his activities, his job, his work at the church, and all these things, his association with COs, there were just none of those common similar issues with Mr. Martin, who we are incredibly pleased to have on this jury, because we think he's going to be a great juror. So, based on that, Judge, there's absolutely not a race based use of our peremptories under *Batson*, even assuming that he's made a showing of a pattern.

*Id*. at 152-155. Howard responded by noting that the black juror the State did not strike had also been falsely arrested for traffic tickets, and Howard argued that by the State's logic, they should have struck that juror too. The State responded that that juror—who in fact had already paid the tickets before he was arrested—did not seem bitter about the encounter, and therefore, the State did not find it to be of concern. The state district court was satisfied that the State articulated race-neutral bases for striking the two black jurors and denied Howard's motion. *Id*. at 157-158.

The Nevada Court of Appeals rejected this claim finding that the record supported the trial court's decision to strike the prospective jurors.

We next consider whether the district court abused its discretion by denying Howard's *Batson* challenge. When a party challenges a peremptory strike and sets forth a prima facie case of discrimination, the

proponent of the strike must provide a race-neutral reason for the strike, after which the district court must determine whether the party opposing the strike established purposeful discrimination. *Guitron v. State*, 131 Nev. _, _, 350 P.3d 93, 103-04 (Ct. App. 2015). The proponent's reason for striking a juror "need not be either persuasive or plausible so long as it does not deny equal protection." *Id*. The opponent's burden to show discrimination is "a heavy one," and this court gives the district court's factual findings "great deference." *Id*. at_, 350 P.3d at 104.

The record supports the district court's decision. The struck jurors both had close family members who were or had been incarcerated. One juror related a negative experience with law enforcement, and the other appeared to avoid revealing his feelings toward the criminal justice system. Although Howard argued the State failed to strike a similarly situated juror of a different race, the State readily distinguished this third juror by his forthright answers and his more neutral view of the criminal justice system. Therefore, the district court did not abuse its discretion by denying the challenge.

Exh. 70, pp. 4-5.

The State set forth specific, race-neutral bases for striking the two black jurors.

Howard has not shown that the Nevada Court of Appeals' decision on federal ground 11 was contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).  Federal habeas relief is denied as to ground 11.

**Ground 14**

Howard claims that the State presented insufficient evidence to convict him of burglary in violation of his Fifth, Sixth, and Fourteenth Amendment rights (ECF No. 7, pp. 29-31). "The Constitution prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 309 (1979) (citing *In re Winship*, 397 U.S. 358 (1970)).  On federal habeas corpus review of a judgment of conviction pursuant to 28 U.S.C. § 2254, the petitioner "is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt."  *Id*. at 324.  "[T]he standard must be applied with explicit reference to the substantive elements

1    of the criminal offense as defined by state law." *Id*. at 324 n.16.  On habeas review, this

2    court must assume that the trier of fact resolved any evidentiary conflicts in favor of the

3    prosecution and must defer to such resolution.  *Id*. at 326.  Generally, the credibility of

4    witnesses is beyond the scope of a review of the sufficiency of the evidence.  *Schlup v.*

5    *Delo*, 513 U.S. 298, 330 (1995).

6        Pursuant to NRS 205.060, burglary in Nevada is the entering of a building with the

7    intent to commit larceny. The victim, Jonathan Gagne, testified that he was a tow-truck

8    driver. Exh. 38, pp. 26-71, 76-147.[4]  He was working on the night in question; he

9    stopped home at 1:30 a.m. to pick up his car because he and his wife were sharing one

10   car at the time. His garage door opened manually, and he left it a few inches open so

11   that it would be easier to open when he returned in less than thirty minutes after

12   dropping the tow truck back at work. He noticed a green Jeep parked near his house

13   that he had never seen before. He then saw that his garage door was open, and

14   someone was standing inside. The man fled as Gagne pulled into the driveway; Gagne

15   thought he might have gone into the house, so he ran in to check on his family. Coming

16   back outside, Gagne saw that some of his tools, a weed eater, and a blower, all of

17   which had been stored in the garage, were sitting out on the driveway. He went to put

18   them in the garage when he saw someone run out of his neighbor's yard. Gagne got in

19   his car, reversed out of his driveway, and could see the person running. The man ran to

20   the Jeep and started to drive away. Gagne tried to block him, but the man evaded him

21   and drove away. Gagne followed him while calling 911. He gave the 911 operator the

22   license plate number. Gagne pursued him until the police pulled over the Jeep. The

23   police showed him Howard, and he confirmed that that was the man he saw in his

24

25       [4] The court makes no credibility findings or other factual findings regarding the truth or
     falsity of evidence or statements of fact in the state court record. The court summarizes the same
26   solely as background to the issues presented in this case, and it does not summarize all such
     material. No assertion of fact made in describing statements, testimony, or other evidence in the
27   state court constitutes a finding by this court. Any absence of mention of a specific piece of
     evidence or category of evidence does not signify the court overlooked it in considering Goode's
28   claims.

1     garage. Gagne also identified Howard at trial as the man he saw in his garage. Gagne

2     read from his statement to the police that night: "I am 100 percent positive that the guy

3     that you have was the one that was in my garage. The clothes are the same, and the

4     Jeep is the one that I seen by my house, and one he got in and I followed him to Jones

5     and Russell [streets]." *Id*. at 68.

6        On cross-examination, Gagne said that he identified Howard as the perpetrator

7     based on the car and his clothing. Howard questioned Gagne about inconsistencies in

8     his statements to the 911 operator; Gagne responded that he may have made

9     confusing, inconsistent, or incorrect statements in his frantic state as he pursued the

10    Jeep and worried at the same time if anyone else might be in or near his home where

11    his wife and newborn slept.

12        The Nevada Court of Appeals rejected this claim on direct appeal:

13
14          Howard's argument that the evidence was insufficient is belied by the
record. Evidence is sufficient to support a verdict if "any rational trier of
fact could have found the essential elements of the crime beyond a
15          reasonable doubt." *Higgs v. State*, 126 Nev. 1, 11, 222 P,3d 648, 654
(2010) (quoting *Rose v. State*, 123 Nev. 194, 202, 163 P.3d 408, 414
16          (2007) (internal quotations omitted)). And, "it is the jury's function, not that
of the court, to assess the weight of the evidence and determine the
17          credibility of the witnesses." *Rose*, 123 Nev. at 202-03, 163 P.3d at 414
(internal quotations omitted). Here, the prosecution presented evidence
18          from the victim and the responding officers. Although some discrepancies
existed between the statements, the evidence was sufficient that a rational
19          juror could find Howard guilty of burglary. [FN4]

20
21          [FN4: In reviewing the sufficiency of the evidence, this court considers
the evidence before the trial court regardless of whether the evidence was
22          erroneously admitted, as this court cannot know what other evidence may
have been offered had the contested evidence been excluded. *Stephans*
23          *v. State*, 127 Nev. 712, 721, 262 P.3d 727, 734 (2011). Thus, to the extent
Howard argues this court should not consider certain evidence that may
24          have been erroneously admitted, we do not credit this argument.]

25    Exh. 70, pp. 5-6.

26        Howard fails to demonstrate that no rational juror could have found the essential

27    elements of the crime beyond a reasonable doubt. He has not shown that the Nevada

28    Court of Appeals' decision that federal ground 14 lacks merit was contrary to, or an

1   unreasonable application of, clearly established federal law.  Federal habeas relief,

2   therefore, is denied as to ground 14.

3           b.  **Ineffective Assistance of Counsel Claims**

4

5           Three claims of ineffective assistance of appellate counsel (IAC) are before the

6   court. IAC claims are governed by the two-part test announced in *Strickland v.*

7   *Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court held that a

8   petitioner claiming ineffective assistance of counsel has the burden of demonstrating

9   that (1) the attorney made errors so serious that he or she was not functioning as the

10  "counsel" guaranteed by the Sixth Amendment, and (2) that the deficient performance

11  prejudiced the defense. *Williams*, 529 U.S. at 390-91 (citing *Strickland*, 466 U.S. at

12  687). To establish ineffectiveness, the defendant must show that counsel's

13  representation fell below an objective standard of reasonableness. *Id*. To establish

14  prejudice, the defendant must show that there is a reasonable probability that, but for

15  counsel's unprofessional errors, the result of the proceeding would have been different.

16  *Id*. A reasonable probability is "probability sufficient to undermine confidence in the

17  outcome." *Id*. Additionally, any review of the attorney's performance must be "highly

18  deferential" and must adopt counsel's perspective at the time of the challenged conduct,

19  in order to avoid the distorting effects of hindsight. *Strickland*, 466 U.S. at 689. It is the

20  petitioner's burden to overcome the presumption that counsel's actions might be

21

22  considered sound trial strategy. *Id*.

23

24          Ineffective assistance of counsel under *Strickland* requires a showing of deficient

25  performance of counsel resulting in prejudice, "with performance being measured

26  against an objective standard of reasonableness, . . . under prevailing professional

27

28  norms." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (internal quotations and citations

omitted). When the ineffective assistance of counsel claim is based on a challenge to a guilty plea, the *Strickland* prejudice prong requires a petitioner to demonstrate "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

If the state court has already rejected an ineffective assistance claim, a federal habeas court may only grant relief if that decision was contrary to, or an unreasonable application of, the *Strickland* standard. *See Yarborough v. Gentry*, 540 U.S. 1, 5 (2003). There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id*.

The United States Supreme Court has described federal review of a state supreme court's decision on a claim of ineffective assistance of counsel as "doubly deferential." *Cullen*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). The Supreme Court emphasized that: "We take a 'highly deferential' look at counsel's performance . . . through the 'deferential lens of § 2254(d).'" *Id*. at 1403 (internal citations omitted). Moreover, federal habeas review of an ineffective assistance of counsel claim is limited to the record before the state court that adjudicated the claim on the merits. *Cullen*, 563 U.S. at 181-84. The Supreme Court has specifically reaffirmed the extensive deference owed to a state court's decision regarding claims of ineffective assistance of counsel:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id*. at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S. at 123. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S. at 124. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness

under § 2254(d). When § 2254(d) applies, the question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington*, 562 U.S. at 105. "A court considering a claim of ineffective assistance of counsel must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Id*. at 104 (quoting *Strickland*, 466 U.S. at 689). "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Id*. (internal quotations and citations omitted).

**Ground 3**

Howard asserts that appellate counsel was ineffective in challenging the denial of his motion to continue trial (ECF No. 10, pp. 13-15). At a status hearing on Wednesday, July 8, 2015, Howard complained that he had asked the investigator specifically to take photos of the area in the vicinity of Gagne's house and the intersection where he was arrested at night. Exh. 35, pp. 3-11. The investigator was present and informed the court that the area in question was very dark at night, and he did not have the proper equipment to take night photos. The State informed the court that it would not oppose Howard calling the investigator as a witness to explain the difficulty and that the trial could still proceed on Monday (July 13). Howard then had the following exchange with the court:

> COURT: You don't trust what, sir?
>
> DEFENDANT: The investigator. I really don't trust him no more, you know. He told me Sunday he had the footage and everything then they come and show me today he don't have it. Now he telling me, you know, my camera couldn't get it and all that. Well, all of that is throwing me off so what I asking of the Court right now is for a continuance so I can hire attorneys so that we can go get the footage so we could get a real investigator to go out there and get the footage so I can have it for my defense. I really believe my defense need this because I believe the jury need to see that by the condition in which that - - were that night.
>
> COURT: So now you're telling me you have the money to hire private counsel.

1
2
3

DEFENDANT: I got to try and do something, you know what I'm saying. I got to try and do something, Your Honor. You know, at this moment I don't but I got to try and do something. I got to try to either tap into relatives or try to do something because I see right now that I'm put in a predicament.

4   Exh. 35, p. 10.

5   The State opposed any continuance and reaffirmed that it had no objection to the

6   investigator testifying. The court denied the continuance:

7
8
9

I'm not inclined to give you a continuance. This case has a long, tortured history. This Court has bent over backward to accommodate you with respect to representation, now non-representation, stand-by counsel. This case is going to trial on Monday.

10   *Id*. at 11.

11   Howard called the investigator to testify at trial. Exh. 40, pp. 145-152. The

12   investigator testified that he was ultimately able to video the cul-de-sac area where

13   Gagne lived at night by using the headlights of two vehicles. He testified that there were

14   no streetlights and visibility was low.

15   Appellate counsel argued that the trial court's denial of Howard's motion for a

16   continuance violated his due process and fair trial rights (ECF No. 10, pp. 17-18).

17   Affirming the denial of Howard's state postconviction petition, the Nevada Court of

18   Appeals held, in a cursory fashion, that he could not demonstrate prejudice with respect

19   to his claims regarding a continuance and a mistrial:

20
21
22
23
24

Howard claimed counsel was ineffective for failing to support two of his direct-appeal arguments with relevant case authority . . . Assuming, without deciding, that counsel was deficient, Howard failed to support his bare claims with specific factual allegations that, if true and not belied by the record, would have demonstrated he was prejudiced by any deficient performance. We therefore conclude the district court did not err by denying Howard's petition without first conducting an evidentiary hearing. *See Hargrove v. State*, 100 Nev. 498, 502-03, 686 P.2d 222, 225 (1984).

25   Exh. 91, pp. 2-3.

26   This claim is meritless. The court notes that the jury was shown photos of the

27   area and the nighttime video. Gagne also specifically testified that there were no

28   streetlights, and it was very dark at night. Howard has not shown that the Nevada Court

1    of Appeals' decision on federal ground 3 was contrary to or involved an unreasonable

2    application of *Strickland* or was based on an unreasonable determination of the facts in

3    light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d). The

4    court denies habeas relief on ground 3.

5    **Ground 1**

6        Howard claims that his appellate counsel was ineffective for failing to challenge

7    an unduly suggestive "show-up" identification on appeal (ECF No. 10, pp. 3-6).

8        Appellate counsel must "examine the record with a view to selecting the most

9    promising issues for review." *Jones v. Barnes*, 463 U.S. 745, 752 (1983). Although "it is

10   still possible to bring a *Strickland* claim based on counsel's failure to raise a particular

11   claim, . . . it is difficult to demonstrate that counsel was incompetent." *Smith v. Robbins*,

12   528 U.S. 259, 288 (2000). Appellate counsel cannot be found to be ineffective for failure

13   to raise an issue that lacks merit. *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989).

14   "In most cases, an unpreserved trial error will not be a plainly stronger ground for

15   appeal than preserved errors. Thus, in most instances in which the trial court did not

16   rule on the alleged trial error (because it was not preserved), the prisoner could not

17   make out a substantial claim of ineffective assistance of appellate counsel . . ." *Davila v.*

18   *Davis*, 137 S. Ct. 2058, 2067 (2017) (Internal citations omitted).

19       With a "show-up" identification, courts generally inquire whether, under the

20   totality of the circumstances, "the confrontation conducted in the case was so

21   unnecessarily suggestive and conducive to irreparable mistaken identification that [the

22   defendant] was denied due process of law." *Stovall v. Denno*, 388 U.S. 293, 301–02

23   (1967) abrogated on other grounds by *Griffith v. Kentucky*, 479 U.S. 314 (1987). Even if

24   the show-up was unnecessarily suggestive, the question is whether the identification is

25   nevertheless reliable. *Manson v. Braithwaite*, 432 U.S. 98, 114 (1977). In assessing the

26   prejudicial effect from a suggestive procedure, the court considers factors including (1)

27   the witness' opportunity to view the suspect at the time of the offense, (2) the witness'

28   degree of attention, (3) the accuracy of the witness' prior description, (4) the witness'

1  level of certainty at the show-up, and (5) the time between the crime and the show-up.

2  *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972).

3       As discussed above, Gagne testified that he called 911 while pursuing the Jeep

4  and continued to follow it until the police pulled it over. Exh. 38. He stated that he

5  rushed home to ensure there were no other intruders and that his family was safe.

6  Police officers then transported him back to where they had apprehended Howard.

7  Gagne confirmed that that was the man that he had seen in his garage and that he had

8  watched run to the Jeep and drive off. He stated that he recognized Howard based on

9  his clothing and the car.

10       Howard did not object to or move to suppress or limit Gagne's identification

11  testimony. He did not object to or move to suppress the testimony by two police officers

12  that Gagne identified Howard as the perpetrator at the show-up. *See* exh. 38, pp. 178-

13  179; exh. 40, pp. 27-29. Howard thus failed to preserve the issue for appeal.

14       The Nevada Court of Appeals disagreed that appellate counsel was ineffective in

15  its order affirming the denial of his state habeas petition:

16       Howard claimed counsel was ineffective for failing . . . to challenge
17  an allegedly suggestive show-up identification. Assuming, without
    deciding, that counsel was deficient, Howard failed to support his bare
18  claims with specific factual allegations that, if true and not belied by the
    record, would have demonstrated he was prejudiced by any deficient
19  performance. We therefore conclude the district court did not err by
    denying Howard's petition without first conducting an evidentiary hearing.
20  *See Hargrove v. State*, 100 Nev. 498, 502-03, 686 P.2d 222, 225 (1984).

21      Exh. 91, pp. 2-3.

22       Even assuming, *arguendo*, that the show-up was unduly suggestive, there is no

23  evidence that the identification was unreliable. Howard has failed to demonstrate that

24  the Nevada Court of Appeals' decision on federal ground 1 was contrary to or involved

25  an unreasonable application of *Strickland* or was based on an unreasonable

26  determination of the facts in light of the evidence presented in the state court

27  proceeding.  28 U.S.C. § 2254(d).  The court denies federal habeas relief on ground 1.

28

1    **Ground 2**

2        Howard argues that his appellate counsel was ineffective in handling the claim on

3    appeal that the state district court erred in denying his motion for mistrial (ECF No. 10,

4    pp. 8-11). He sought a mistrial because the State had a red file on counsel table during

5    trial that contained Howard's criminal history.

6        The Supreme Court has reiterated repeatedly that trial judges may declare a

7    mistrial "whenever, in their opinion, taking all the circumstances into consideration, there

8    is a manifest necessity" for doing so. *Renico v. Lett*, 559 U.S. 766, 773–74 (2010). The

9    decision to declare a mistrial is left to the "sound discretion" of the judge, but "the power

10   ought to be used with the greatest caution, under urgent circumstances, and for very

11   plain and obvious causes." *Id*; *see also Illinois v. Somerville*, 410 U.S. 458, 462 (1973);

12   *Gori v. United States*, 367 U.S. 364, 368 (1961).

13       Toward the end of trial, before closing arguments, Howard pointed out to the

14   court that the State had a red file on counsel table in view of the jury. Exh. 40, pp. 131-

15   132.  The file was marked "R-O-P," and the "O" was partially obscured by a sticker. The

16   State explained that a red file can signify several different things including repeat

17   offenders and murders. The State offered to move the file out of view. They also argued

18   that the jury would have no way of knowing the significance of the file color and would

19   thus not be able to draw any inference from it whatsoever. Howard moved for a mistrial.

20   The court had the State put the file away so that it was not visible to the jury. The court

21   said it was unpersuaded that a mistrial was warranted and denied the motion.

22       Howard's appellate counsel challenged the denial on appeal. Exh. 63, pp. 16-17.

23   As with the claim regarding the motion for continuance, the Nevada Court of Appeals

24   held, with little analysis, that Howard could not demonstrate prejudice:

25           Howard claimed counsel was ineffective for failing to support two of
26       his direct-appeal arguments with relevant case authority . . . Assuming,
         without deciding, that counsel was deficient, Howard failed to support his
27       bare claims with specific factual allegations that, if true and not belied by
         the record, would have demonstrated he was prejudiced by any deficient
28       performance. We therefore conclude the district court did not err by

1   denying Howard's petition without first conducting an evidentiary hearing.
*See Hargrove v. State*, 100 Nev. 498, 502-03, 686 P.2d 222, 225 (1984).

2   Exh. 91, pp. 2-3.

3   While the state appellate court only briefly addressed this claim, it cannot be said

4   that its decision on federal ground 2 was contrary to or involved an unreasonable

5   application of *Strickland* or was based on an unreasonable determination of the facts in

6   light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

7   Howard presented no evidence that the jury had any idea of the significance of the color

8   of the folder. He has shown no plain and obvious cause for a mistrial. *Renico*, 559 U.S.

9   at 773–74. Federal habeas relief is denied as to ground 2.

10  The petition, therefore, is denied in its entirety.

11  **IV.      Certificate of Appealability**

12  This is a final order adverse to the petitioner. As such, Rule 11 of the Rules

13  Governing Section 2254 Cases requires this court to issue or deny a certificate of

14  appealability (COA). Accordingly, the court has *sua sponte* evaluated the claims within

15  the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v.*

16  *Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

17  Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has

18  made a substantial showing of the denial of a constitutional right."  With respect to

19  claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists

20  would find the district court's assessment of the constitutional claims debatable or

21  wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463

22  U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable

23  jurists could debate (1) whether the petition states a valid claim of the denial of a

24  constitutional right and (2) whether the court's procedural ruling was correct. *Id*.

25  Having reviewed its determinations and rulings in adjudicating Howard's petition, the

26  court finds that none of those rulings meets the *Slack* standard. The court therefore

27  declines to issue a certificate of appealability for its resolution of Howard's petition.

28

1       **V.**     **Conclusion**

2       **IT IS THEREFORE ORDERED** that the petition (ECF No. 10) is **DENIED**.

3       **IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED**.

4       **IT IS FURTHER ORDERED** the Clerk of the Court is directed to substitute Calvin

5 Johnson for respondent Brian Williams.

6       **IT IS FURTHER ORDERED** that the Clerk enter judgment accordingly and close this

7 case.

8

9

10       DATED: 21 March 2022.

11

12                                      GLORIA M. NAVARRO

13                                      UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28